IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Department of Justice<br>Antitrust Division<br>450 Fifth Street, N.W.,<br>Suite 8000<br>Washington, D.C. 20530<br><br>*Plaintiff*,<br><br>v.<br><br>GEORGE'S FOODS, LLC<br>P.O. Drawer G<br>Springdale, Arkansas 72765<br><br>GEORGE'S FAMILY FARMS, LLC<br>P.O. Drawer G<br>Springdale, Arkansas 72765<br><br>and<br><br>GEORGE'S, INC.<br>402 West Robinson Avenue<br>Springdale, Arkansas 72764<br><br>*Defendants*. | Civil Action No.: |

## **COMPLAINT**

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil antitrust action for equitable relief against George's Foods, LLC; George's Family Farms, LLC; and George's, Inc. (collectively, "George's") for violating Section 7 of the Clayton Act, 15 U.S.C. § 18. This lawsuit challenges George's acquisition of Tyson Foods, Inc.'s ("Tyson's") Harrisonburg, Virginia chicken

1

processing complex, consummated May 7, 2011 (the "Transaction").  The Transaction violates Section 7 of the Clayton Act because its effect may be substantially to lessen competition for the services of broiler growers operating in and around the Shenandoah Valley area of Virginia and West Virginia.  The United States alleges as follows:

## I. NATURE OF ACTION

1. The United States learned about the Transaction on or about March 18, 2011, when Tyson and George's publicly announced George's intent to buy Tyson's Harrisonburg chicken processing complex.  The United States subsequently opened an investigation into the proposed deal, and issued Civil Investigative Demands ("CIDs") on April 18, 2011, seeking information on the potential competitive effects of the acquisition and George's proposed business justifications for purchasing the plant.  After serving the CIDs, the United States engaged in numerous discussions with the parties to seek the production of relevant information as quickly as possible.  These discussions were continuing at the close of business on Friday, May 6, 2011.  On Saturday, May 7, 2011, without any notice to the United States and before responding to the CIDs, George's and Tyson entered into an asset purchase agreement and simultaneously closed the Transaction.  The parties undertook this action even though they knew that the United States had serious concerns about the Transaction and had requested to be notified prior to the parties' closing the Transaction.

2. George's and Tyson are competing chicken processors, each operating facilities involved in the production, processing, and distribution of "broilers," which are chickens raised for meat products.  George's and Tyson vigorously compete with each other not only in the sale of chicken products, but also for the services of farmers, called

"growers," who care for and raise chicks from the time they are hatched until the time they are ready for slaughter.

3. Processors compete for growers in areas where the processors' plants are close together. Prior to consummation of the Transaction, the Shenandoah Valley region of Virginia and West Virginia was one such area where George's and Tyson competed head-to-head for broiler grower services. There, George's and Tyson operated facilities about 30 miles away from each other—George's with a processing facility in Edinburg, Virginia and a feed mill in Harrisonburg, Virginia; and Tyson with a processing facility in Harrisonburg, Virginia and a feed mill in Mount Jackson, Virginia (between Harrisonburg and Edinburg). Transportation costs are such that processors typically contract with growers within limited geographic areas surrounding their facilities. Because of their close proximity, the area from which Tyson and George's recruit growers for their respective Shenandoah Valley facilities overlap substantially. For growers in that region, Tyson and George's are two of only three processors to whom growers can sell their services.

4. On May 7, 2011, George's entered into an agreement with Tyson under which George's acquired Tyson's Harrisonburg, Virginia chicken processing complex. The complex is capable of processing approximately 32 million chickens per year. Tyson contracted with over 120 area growers to support this facility. As a result of the Transaction, George's controls approximately 43% of chicken processing capacity in the Shenandoah Valley, with only one other remaining competitor, Pilgrim's Pride Corporation ("Pilgrim's Pride").

5.      Competition among processors is critical to ensure that the hundreds of Shenandoah Valley-area growers receive competitive prices and contract terms for their services. There are nearly 500 broiler growers in the Virginia portion of the Shenandoah Valley alone, and in 2007, processors paid growers in the region about $40 million to raise approximately 160 million chickens.

6.      The growers' ability to switch to a competing processor has been an important competitive restraint on processors. Elimination of Tyson as an alternative buyer will allow George's unilaterally to decrease prices or degrade contract terms to farmers for grower services in that region. Although there is one other competing processor in the area, Pilgrim's Pride, that processor does not have sufficient capacity to take on significant numbers of growers if George's were to depress payments to growers. The Transaction also makes it more likely that George's and Pilgrim's Pride will engage in anticompetitive coordination to depress prices for broiler grower services.

7.      The Transaction therefore violates Section 7 of the Clayton Act, as amended, 15 U.S.C § 18.

## II.     JURISDICTION AND VENUE

8.      The United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, in order to prevent and restrain George's from continuing to violate Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

9.      Defendants purchase broiler grower services in the flow of interstate commerce, and their activities substantially affect interstate commerce. The Court has subject matter jurisdiction over this action and jurisdiction over the parties pursuant to 15 U.S.C. § 25 and 28 U.S.C. §§ 1331 and 1337.

10. Defendants transact business and are found within the Western District of Virginia. Venue is proper in this district under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c).

### III. DEFENDANTS

11. George's Foods, LLC is a limited liability company organized and existing under the laws of the Commonwealth of Virginia. George's Family Farms, LLC is a limited liability company organized and existing under the laws of the Commonwealth of Virginia. George's, Inc. is a corporation organized and existing under the laws of the State of Arkansas. George's Foods, LLC and George's Family Farms, LLC were joint purchasers of Tyson's Harrisonburg complex. Related George's entities operate production facilities in Springdale, Arkansas; Cassville, Missouri; and Edinburg, Virginia.

### IV. TRADE AND COMMERCE

A. The Broiler Growing Industry

12. Chicken processors produce a variety of fresh, frozen, further processed, and ready to eat chicken products for retail, institutional, big-box, and food-service outlets. George's and Tyson are each vertically integrated, *i.e.*, both run in-house breeding operations, hatcheries, feed-mills, slaughtering plants, and further processing plants staffed with company employees. This type of chicken producer is commonly referred to as an "integrator." The one significant operation not performed in-house is actually raising the chickens from the time they are hatched until the time they are ready for slaughter, which takes about thirty-five to sixty days. This task is contracted out to hundreds of small, independent farmers, called "growers."

5

13.     Growers work under production contracts with a nearby processor. The processor typically provides the chicks, feed, and any necessary medicine. The processor also transports the chicks and feed to the farms, and transports the chickens to the processing plant. The grower typically provides the chicken houses, equipment, labor, and other miscellaneous expenses related to chicken care. The processor maintains ownership of the birds throughout the process.

14.     Caring for chickens requires regular deliveries of feed from the processor, which bears the associated transportation costs. In addition, when delivering mature birds for processing, the greater the distance between the grower and the processor, the greater the chicken mortality, chicken weight loss, and labor costs. For these reasons, processors value having growers located close to the processing facilities.

15.     There is no cash market for the purchase of broilers, so farmers who want to raise broilers must contract with a nearby integrator to raise chicks owned by that integrator.

16.     Processors typically compensate growers through a competitive "tournament" system, which includes a base payment and a performance component. Growers with premium housing typically receive a higher base rate. Relative performance can also be a significant factor in how much a grower is paid: growers will receive greater payments if their broilers have lower mortality rates and more efficient feed conversion than other growers also delivering to the integrator at the same period. As a result, a grower's pay can fluctuate greatly from flock to flock.

17.     When a grower enters the business, he or she must build houses to shelter the chickens. Chicken houses typically cost between $100,000 and $300,000 depending

6

on their size and features. In some instances, growers have been able to convert existing turkey houses to chicken houses, but such conversions still require significant investment.

18. Despite the growers' long-term investment in real-estate, facilities and equipment, contracts for grower services are often very short-term—sometimes just a single flock. Processors do not typically guarantee growers a specific number or flocks per year, nor do they guarantee growers a certain number of birds per flock.

19. Growers, by regulation under the Packers and Stockyards Act, can terminate their relationship with a processor by giving 90 days notice. Growers' primary source of bargaining power when negotiating with integrators is the ability to switch to another integrator. Prior to the Transaction, there were three integrators in the Shenandoah Valley—Tyson, George's, and Pilgrim's Pride. Now, growers in the Shenandoah Valley have just two alternatives, George's and Pilgrim's Pride.

      B.    Relevant Market

20. The purchase of broiler grower services from chicken farmers in the Shenandoah Valley and nearby areas is a line of commerce and a relevant market within the meaning of Section 7 of the Clayton Act.

21. In order to enter the chicken growing business, growers make significant investments that are highly specific to broiler production. They must build chicken houses that may cost from $100,000 to $300,000, and have a 30-year economic life. Many growers take out substantial loans in order to make these investments. Chicken houses have no practical alternative use. If a grower were to stop raising chickens, his or her best option would likely be to raze the chicken-raising facilities because converting a chicken house to a house suitable for another use involves substantial expense. For

7

instance, converting a chicken house to one suitable for turkey growing can cost more than $100,000. Most chicken farmers would not abandon their investments in chicken houses in response to small decreases in the prices and other contract terms they receive for their services. The relevant product market is the purchase of broiler grower services.

22. Processors typically contract with growers who are located close to their processing complexes. The processors must bear the cost of transporting feed and live birds to the grower. Due to storage constraints, processors deliver feed to growers several times a week. Indeed, processors often offer incentives to encourage growers to build houses near the processing complex. In the Shenandoah Valley, processors rarely contract with growers who are located more than fifty to seventy-five miles from the processor's feed mill and processing plant. The geographic area within which a chicken processor contracts with growers (*i.e.*, the area within which the processor delivers chicks and feed and picks up mature broilers) is known as the "draw area" for the facility. The overlapping draw areas of Tyson and George's, consisting of the Shenandoah Valley area within a commercially reasonable range of their processing facilities, is a relevant geographic market within the meaning of Section 7 of the Clayton Act.

23. In response to a small but significant, non-transitory price decrease by processors, growers within fifty to seventy-five miles of the Edinburg and/or Harrisonburg facilities would not switch to processors outside the Shenandoah Valley region, switch to providing any other service, or cease growing chickens, in sufficient numbers to render such a price decrease unprofitable.

8

### C. Anticompetitive Effects

24. The Transaction will likely lessen competition for purchases of grower services in the relevant geographic market. As a result of the Transaction, George's controls approximately 43% of chicken processing capacity in the Shenandoah Valley. Using a measure of market concentration called the Herfindahl-Hirschman Index ("HHI"), the post-acquisition HHIs increased by approximately 700 points, resulting in a post-acquisition HHI of over 5,000 points. As defined and explained in Appendix A, where, as here, changes in HHIs establish that an acquisition significantly increases concentration resulting in a highly concentrated market, such acquisitions are presumed likely to enhance market power. *See Horizontal Merger Guidelines* § 5.3. By reducing the number of purchasers of broiler grower services from three to two in the Shenandoah Valley, the Transaction will likely result in reduced competition, with likely effects including depressed prices paid and less attractive contract terms offered to farmers.

25. Prior to the Transaction, the only competitive buyers for grower services in the Shenandoah Valley were George's, Tyson, and Pilgrim's Pride. Tyson's former facility in Harrisonburg is capable of processing about 32 million chickens per year. George's facility in Edinburg is about 30 miles north of Harrisonburg and is capable of processing about 88 million chickens per year. Pilgrim's Pride operates two facilities in the region: one in Timberville, which lies between Harrisonburg and Edinburg, and is capable of processing 34 million chickens per year, and one in Moorefield, West Virginia, approximately 40 miles from Harrisonburg (about 125 million chickens per year). Alternative processors are too far away to be viable economic alternatives.

26. Farmers have benefited from competition between Tyson, George's, and Pilgrim's Pride in a variety of respects. In addition to the base rate offered to growers, there are a number of other factors that affect the total compensation offered to farmers. The contracts offered by the three processors are to some degree different, and farmers consider these differences when choosing an integrator or deciding to switch. These differences illustrate the various ways in which processors compete. For example:

    a. Integrators may differ greatly in the extent to which they share various costs with the growers. For instance, George's pays the full cost of treating the chickens' bedding (a necessary step to prepare a house for a new flock), while Tyson only pays half.

    b. Integrators also compete for grower services in the number of flocks they provide growers per year, a factor which greatly affects a farmer's income. In recent times, "lay-outs," or the time between flocks, for some growers in the Shenandoah Valley have stretched from ten to twelve days to three or four weeks for some growers, leaving growers with fewer flocks per year. If a grower cannot shift to another integrator when lay-outs increase, his or her only choice is to let houses sit idle.

    c. Another point of differentiation is the extent to which processors encourage (or require) growers to make substantial investments to upgrade their houses. For example, an integrator may insist that all growers convert their chicken houses from the standard "curtain" ventilation to the more efficient "tunnel" ventilation. If a grower

prefers not to make such an investment, he or she may refuse to upgrade the facilities and move to another integrator that does not require tunnel ventilation, if one is available.

    d. Similarly, processors differ in the extent to which they support grower investment in upgrades to their houses. When Tyson's recently sought new houses for its Edinburg plant, it offered interested growers the option of entering into a longer-term contract with a set number of flocks and price per pound.

27. Switching to another processor is the grower's only practicable recourse in the face of unfavorable contract terms. Farmers make substantial sunk investments in specialized chicken-raising facilities, often going deep into debt. It is prohibitively costly to convert those facilities to other uses. Growers do not have a cash market to turn to, nor can they feasibly turn to processors outside the Shenandoah Valley.

28. The Transaction eliminated one of only three alternative outlets for farmers in the Shenandoah Valley. As a result of the transaction, many George's and former Tyson growers no longer have an alternative to turn to, and have no choice but to contract with George's. Pilgrim's Pride does not have sufficient capacity to take on growers in sufficient numbers to thwart an exercise of market power by George's. Likewise, Pilgrim's Pride growers in the region will be harmed because they will lose one of their only two alternative sources for selling their services.

29. If a grower cannot switch or threaten to switch to another integrator when any of the terms of his or her contract deteriorate, he or she would likely choose to accept inferior terms rather than to have no contract at all. The Transaction is therefore likely to

11

enhance George's incentive and ability to force growers to accept lower prices and less favorable contractual terms for grower services. This loss of competition could take the form of lower base prices, fewer allowances for miscellaneous expenses, longer layouts between broiler growing services, or other unfavorable adjustments to growers' contracts. In addition, the Transaction likely will enable easier and more durable coordinated interaction between George's and its only remaining competitor, Pilgrim's Pride.

## V. ABSENCE OF COUNTERVAILING FACTORS

30. New entry into the production and sale of broiler chickens is costly and time consuming. Construction of a large-scale chicken processing facility would require investment of at least $35 million and take two or more years to obtain necessary permits, plan, design, and build. In addition, there are significant costs and inefficiencies associated with the start-up period of a new chicken processing facility. Repositioning by firms or facilities that slaughter primarily turkeys would require additional capital investment. Moreover, a turkey processor seeking to add chicken products to its offering would first need to find customers for its output prior to contracting with growers. Entry or repositioning into broiler chicken production would therefore not be timely, likely, or sufficient to defeat a small but significant, non-transitory decrease in the price of broiler grower services.

## VI. CAUSE OF ACTION

31. The United States incorporates the allegations of paragraphs 1 through 30 above.

32. George's acquisition of Tyson's Harrisonburg, Virginia chicken complex will substantially lessen competition for the purchase of broiler grower services in the

12

Shenandoah Valley in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The Transaction would likely have the following effects, among others:

    a. actual and potential competition between George's and Tyson in the procurement of broiler grower services in the Shenandoah Valley will be eliminated;

    b. competition generally in the procurement of broiler grower services in the Shenandoah Valley will be substantially lessened; and

    c. suppliers of broiler growing services will receive less than competitive prices or less competitive contract terms for their services.

## VII. REQUESTED RELIEF

33. The United States requests that:

    a. the acquisition of Tyson's Harrisonburg, Virginia poultry complex by George's be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

    b. divesture of such assets and interests sufficient to restore competition in the Shenandoah Valley be ordered;

    c. George's be permanently enjoined from further ownership and operation of the assets acquired as part of the Transaction;

    d. the United States be awarded their costs of this action; and

    e. the United States be awarded such other and further relief as the case requires and the Court deems just and proper.

Dated: May 10, 2011

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:

| | |
|---|---|
| /s/ Christine A. Varney<br>CHRISTINE A. VARNEY<br>Assistant Attorney General for Antitrust | /s/ Jill A. Ptacek<br>JILL A. PTACEK (WA Bar # 18756)<br>Attorney<br>Transportation, Energy<br>   and Agriculture Section<br>Antitrust Division<br>U.S. Department of Justice<br>450 Fifth Street, N.W., Suite 8000<br>Washington, DC  20530<br>Telephone: (202) 307-6607<br>Facsimile: (202) 307-2784<br>E-mail: jill.ptacek@usdoj.gov |
| /s/ Sharis a. Pozen<br>SHARIS A. POZEN<br>Deputy Assistant Attorney General | |
| /s/ Joseph F. Wayland<br>JOSEPH F. WAYLAND<br>Deputy Assistant Attorney General | TIMOTHY J. HEAPHY<br>United States Attorney<br>Western District of Virginia |
| /s/ Patricia A. Brink<br>PATRICIA A. BRINK<br>Director of Civil Enforcement | /s/ Rick A. Mountcastle<br>Assistant United States Attorney<br>VSB 19768<br>P. O. Box 1709<br>Roanoke, VA  24008-1709<br>Telephone: ( 540) 857-2254<br>Facsimile:  (540) 857-2283<br>E-mail:  rick.mountcastle@usdoj.gov |
| /s/ William H. Stallings<br>WILLIAM H. STALLINGS<br>Acting Chief<br>Transportation, Energy,<br>   and Agriculture Section | Attorneys for the United States |